UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

        Plaintiff,

v.

William David Alonzo (2), and
Timothy Joseph Beaulieu, Jr. (7),

        Defendants.

Court File No. 15-cr-165 (JRT/LIB) (2), (7)

**ORDER AND
REPORT AND RECOMMENDATION**

This matter comes before the undersigned United States Magistrate Judge upon Defendant William David Alonzo's ("Defendant Alonzo") Motion for Severance or, in the Alternative, to Join the Co-Defendant's Motions, [Docket No. 669]; Defendant Alonzo's Motion to Suppress Evidence Found in Vehicle, [Docket No. 671]; Defendant Alonzo's Motion to Suppress Defendant's Statements, Admissions, and Answers, [Docket No. 672]; and Defendant Timothy Joseph Beaulieu, Jr.'s ("Defendant Beaulieu") Motion to Suppress Evidence and Statements, [Docket No. 855]. This case has been referred to the undersigned Magistrate Judge for a report and recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Local Rule 72.1. The Court held a motions hearing on October 20, 2015, regarding the parties' pretrial motions.[1] At the motion hearing, the Court granted the parties' requests for the opportunity to provide supplemental briefing. The Court took Defendant Alonzo's Motion for Severance or, in the Alternative, to Join the Co-Defendant's Motions, [Docket No. 669]; Defendant Alonzo's Motion to Suppress Evidence Found in Vehicle, [Docket No. 671]; Defendant Alonzo's Motion to Suppress Defendant's Statements, Admissions, and Answers, [Docket No. 672]; and Defendant

---

[1] The Court addressed the parties pretrial motions for discovery and for production of evidence by separate Orders, [Docket Nos. 972, 992].

Beaulieu's Motion to Suppress Evidence and Statements, [Docket No. 855], under advisement on November 15, 2015.

For the reasons discussed herein, the Court will **DENY** by Order Defendant Alonzo's Motion for Severance or, in the Alternative, to Join the Co-Defendant's Motions, [Docket No. 669], to the extent that Defendant Alonzo seeks to join in all of the motions of his co-defendants.

Also, for the reasons discussed further herein, the Court issues its Report and Recommendation that Defendant's Alonzo's Motion for Severance or, in the Alternative, to Join the Co-Defendant's Motions, [Docket No. 669], be **DENIED** to the extent that Defendant Alonzo seeks severance of the trial of his case from those of his co-defendants; the Court also recommends that Defendant Alonzo's Motion to Suppress Evidence Found in Vehicle, [Docket No. 671] be **DENIED**; that Defendant' Alonzo's Motion to Suppress Defendant's Statements, Admissions, and Answers, [Docket No. 672], be **DENIED**; and that Defendant Beaulieu's Motion to Suppress Evidence and Statements, [Docket No. 855], be **DENIED**.

## I.     BACKGROUND AND STATEMENT OF FACTS

### A. Background

On May 20, 2015, Defendant Alonzo and Defendant Beaulieu were indicted with charges of conspiracy to distribute heroin, methamphetamine, oxycodone, hydromorphone, hydrocodone, and methadone, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 841(b)(1)(C), and 846; aiding and abetting possession with intent to distribute heroin, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B); aiding and abetting possession with intent to distribute hydrocodone, methadone, and oxycodone, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); and aiding and abetting possession of a firearm during and in

relation to a drug trafficking crime, in violation of 18 U.S.C. §§ 2 and 924(c). (Indictment [Docket No. 1]).

**B. Facts[2]**

In October of 2014, Drug Enforcement Agency ("DEA") Task Force Officer Thomas Maloney ("TFO Maloney") joined a narcotics trafficking investigation of Defendant Omar Sharif Beasley ("Defendant Beasley"). During the course of the investigation, law enforcement officials received authorization to conduct electronic surveillance and intercepts of a cellular phone used by Defendant Beasley. The investigating officers learned that Defendant Beasley had on several occasions turned his cellular phone off while travelling between Minneapolis, Minnesota, and Detroit, Michigan, for the purpose of transporting illegal narcotics.

On March 8, 2015, Defendant Beasley, who had at that time been in the Detroit area, shut off his cellular phone, which led the investigating officers to conclude that Defendant Beasley may have been returning to Minneapolis with a quantity of illegal narcotics, specifically heroin.

On the morning of March 9, 2015, the investigating officers received a cell tower signal from Defendant Beasley's cellular phone that indicated that the phone was then in Wisconsin. Based on that information, the officers set up visual surveillance on major traffic routes looking for a white BMW vehicle that they associated with Defendant Beasley. The officers later received additional cell tower information which placed the location of the cellular phone closer to the Minneapolis area. In an attempt to locate Defendant Beasley's vehicle, the investigating

---

[2]The facts are derived from the testimony of Minnesota State Highway Patrol Trooper Christopher James, Minnesota State Highway Patrol Trooper Michael Flanagan, and Drug Enforcement Agency Task Force Officer Thomas Maloney at the October 20, 2015, motions hearing. After that motions hearing, Defendant Beaulieu submitted 16 pages of exhibits attached to his supplemental memorandum in support of his motion.  Those exhibits were not offered at the motions hearing and Defendant did not seek leave of Court to submit those exhibits after the motions hearing. The Court has not relied on those proposed exhibits in drafting the statement of facts.

officers split up to go to various areas in and around Minneapolis that they knew Defendant Beasley to frequent.

During the late afternoon of March 9, 2015, the investigating officers located Beasley and a number of his known associates at the Quality Inn hotel located in Brooklyn Center, a suburb of Minneapolis. The officers, including TFO Maloney, set up visual surveillance of the hotel. While conducting surveillance of the hotel, the officers identified three vehicles in the hotel's parking lot that they linked to Defendant Beasley and his associates, a tan Jeep Grand Cherokee ("the Jeep") bearing Red Lake Nation license plates, a white BMW ("the BMW") with Michigan plates, and a gold Pontiac Bonneville ("the Pontiac").

At approximately 10 p.m. that same evening, TFO Maloney observed Defendant Beasley and six or seven of his associates leave the Quality Inn hotel. Defendant Beaulieu and Defendant Alonzo were among the members of that group. The group was carrying different types of bags, including duffle bags, shopping bags, and garbage bags. Most of the bags were placed in the cargo area of the Jeep. Other bags were placed into the BMW and the Pontiac. TFO Maloney saw the members of the group get into the three vehicles, including Defendant Beaulieu, whom he saw get into the driver's seat of the Jeep. TFO Maloney then observed as Defendant Beasley drove the BMW out of the parking lot and drive north on interstate 94 towards Saint Cloud, Minnesota, followed in tandem by Jeep and the Pontiac. TFO Maloney and other investigating officers followed. The BMW, the Jeep, and the Pontiac all eventually turned together onto Minnesota Highway 10 headed north.

TFO Maloney then contacted Minnesota State Highway Patrol Trooper Michael Flanagan for the purpose of setting up a stop of the Jeep, which the investigating officers suspected to be most likely to contain narcotics. At that time, Trooper Flanagan was assigned as a handler for

Layka, a narcotics detection dog. Layka is trained to detect base and derivative odors of marijuana, cocaine, heroin, methamphetamine, and mushrooms. Trooper Flanagan and Layka have been certified annually in narcotics detection since January 2014, and they frequently assist other agencies with traffic stops by doing sniff-searches for illegal narcotics. Since that time Layka has performed approximately 150 sniff-searches, and these have resulted in an accuracy rate of detecting narcotics of greater than 93%.

TFO Maloney informed Trooper Flanagan that a vehicle that the investigating officers suspected of being involved in narcotics trafficking was travelling away from the metro area, possibly carrying a quantity of illegal narcotics. TFO Maloney asked Trooper Flanagan to assist with a potential stop of the vehicle. Trooper Flanagan indicated that he and Layka would begin heading towards Saint Cloud and provided TFO Maloney with the number of Minnesota State Highway Patrol Trooper Christopher James as an officer who worked closer to the area the vehicles were travelling in and who could possibly intercept the Jeep.

TFO Maloney then called Trooper James, who was on patrol in Benton County that evening. TFO Maloney informed Trooper James that the Jeep was suspected of transporting heroin and asked him to be on the lookout for the Jeep. TFO Maloney instructed Trooper James to follow the Jeep if he spotted it and to initiate a traffic stop of the Jeep if he observed any traffic violations. TFO Mahoney also told Trooper James that Trooper Flanagan would soon be in the area and would assist with a traffic stop.

Trooper Flanagan later received a second call informing him that the Jeep was at that time travelling north of Saint Cloud, Minnesota, and that Trooper James was going to intercept the Jeep if a traffic violation was observed. Trooper Flanagan and Layka continued to travel

towards the area north of Saint Cloud for the purpose of conducting a sniff-search of the Jeep in the event that Trooper James was able to stop it.

Trooper James was traveling northbound on Minnesota Highway 10 in Benton County when he spotted the Jeep. He turned to follow the Jeep and turned on his squad car's camera. As he followed the Jeep, Trooper James observed the Jeep weave in its lane, driving onto the center line and then onto the fog line. After Trooper James had followed the Jeep for several miles, the two vehicles drove into an area in Rice, Minnesota, that was lit by street lights illuminating an on-ramp. While the vehicles passed through this lit area, Trooper James could see inside the Jeep. Trooper James could see two people inside, the driver and a passenger sitting on the right side of the backseat of the Jeep. Trooper James could also see that the seat belt strap of the rear passenger's seat belt was hanging free, from which Trooper James concluded that the passenger did not have a seatbelt on. Based on his earlier observations that the Jeep had been weaving so as to cross onto the center line and the fog line, and that the rear passenger was not wearing a seat belt, Trooper James then initiated a traffic stop of the Jeep by turning on his emergency lights.[3]

The Jeep was slow to stop once Trooper James turned on his emergency lights, eventually pulling over to stop on the side of the road approximately a quarter of a mile beyond the point at which Trooper James had activated his emergency lights.

Once both of the vehicles came to a stop, Trooper James exited his squad car and approached the Jeep on the driver's side. At that time, Trooper James could see that the front

---

[3] See Minn. Stat. § 169.686 (setting forth fines for vehicle occupant's failure to wear a properly adjusted and fastened seat belt; see also State v. Wendorf, 814 N.W.2d 359, 362 (Minn. Ct. App. 2012) (noting that previous provisions of Minn. Stat. § 169.686 prohibiting an officer from issuing a citation for failure to wear a seatbelt unless the officer had stopped the motor vehicle for a different violation had been removed when the statute was amended in 2009).

passenger seat of the Jeep was empty. Trooper James observed that both the driver and the passenger had freshly lit cigarettes.

Trooper James began speaking to the driver, whom he was able to identify as Defendant Beaulieu. Trooper James asked Defendant Beaulieu questions about where he and the passenger, whom Trooper James later identified as Defendant Alonzo, had come from and where they were going. Both Defendant Beaulieu and Defendant Alonzo were cooperative during the encounter. Defendant Beaulieu told Trooper James that the Jeep had weaved because he was trying to find a cigarette. He also told Trooper James that Defendant Alonzo was sitting in the back seat because cold air blew into the car on the passenger side. Defendant Alonzo, however, repeatedly interrupted Defendant Beaulieu to answer Trooper James's questions. Defendant Alonzo told Trooper James that he and Defendant Beaulieu were friends, had met up in the Minneapolis area where they had been shopping at a Macy's, and were headed to back the Red Lake area. Trooper James found it unusual that Defendant Alonzo was interrupting Defendant Beaulieu to provide answers to Trooper James' questions.

Trooper James then returned to his squad car to run a computer records check on Defendant Beaulieu's and Defendant Alonzo's licenses. As he walked back to the squad car, he looked into the back of the Jeep, and he could not see any Macy's shopping bags.

Trooper Flanagan, who had earlier arrived on the scene shortly after Trooper James had pulled the Jeep over, was standing by Trooper James' squad car when Trooper James returned to it to run the computer records check. Trooper James told Trooper Flanagan that the Defendants stated they were traveling from the Minneapolis area to the Red Lake area. He also told Trooper Flanagan that, during his initial encounter with them, the Defendants both had freshly lit cigarettes; that Defendant Alonzo was sitting in the back seat of the Jeep while the front right

7

passenger seat remained empty; that Defendant Alonzo, the passenger, had interrupted to answer Trooper James' questions rather than letting Defendant Beaulieu answer; and that he had not seen any bags from Macy's in the back of the Jeep where Defendant Alonzo had said the two had previously gone shopping. Trooper Flanagan was aware from his previous experience that the Minneapolis metro area is a source area for illegal narcotics for the Red Lake Indian Reservation. Trooper Flanagan told Trooper James that he believed that Trooper James's observation were a sufficient basis to conduct a dog sniff-search of the exterior of the Jeep for narcotics. The troopers decided to ask Defendant Beaulieu for consent to search the Jeep and, in the event that they did not receive it, to conduct a dog sniff-search of the exterior of the Jeep.

Trooper James then returned to the Jeep and asked Defendant Beaulieu to step out of the vehicle so that he could issue Defendant Beaulieu a warning for the observed traffic violations. When Defendant Beaulieu was outside the jeep, Trooper James gave him a written warning and asked him if the troopers could search the Jeep. Defendant Beaulieu did not give the troopers permission to search the Jeep.

At that point, Trooper Flanagan immediately took over the encounter. Trooper Flanagan went to speak to Defendant Alonzo to request that he exit the Jeep. At that time, Trooper Flanagan detected an odor of marijuana coming from the interior of the Jeep. Trooper Flanagan then had Defendant Alonzo step out from the Jeep. Trooper Flanagan retrieved Layka from his squad car and the troopers had the Defendants stand in front of the Jeep while Trooper Flanagan walked Layka around it, conducting a sniff-search. Layka gave signals at the driver's door and at the beam between the front and rear passenger side doors of the Jeep indicating that she had detected strong odors of at least one of the narcotics that she is trained to detect. Trooper Flanagan then put Layka in the Jeep, where she alerted several more times indicating that she

had detected narcotics odors. The troopers then personally searched the Jeep, during which they located prescription pills and a firearm in a white garbage bag in the rear compartment of the Jeep as well as two clear plastic baggies containing marijuana in the passenger compartment, all of which Trooper Flanagan took into his custody. Trooper Flanagan then transported the seized items to DEA Special Agent Travis Ocken ("SA Ocken") and TFO Maloney, who were parked approximately a quarter mile south of the scene of the traffic stop.

Trooper James and another trooper who had subsequently arrived at the scene in the interim then arrested the Defendants and transported them to the Benton County jail.

On March 10, 2015, at approximately 2 p.m., TFO Maloney and SA Ocken went to the Benton County jail to interview Defendant Beaulieu and Defendant Alonzo. The staff of the Benton County jail directed the officers to a small interview room inside the jail. The room was 10' by 10' with only a single door. There was no recording system in the room. As a result, the officers did not record the interviews because DEA policy requires that specific equipment be used in recording interviews and in its absence that a recording not be made.

The jail staff first brought Defendant Beaulieu to the room. Defendant Beaulieu was not restrained during the interview. The officers shut the door to the interview room. TFO Maloney and SA Ocken identified themselves as law enforcement officers, confirmed Defendant Beaulieu's identity, and then read Defendant Beaulieu the Miranda warnings. To TFO Maloney, Defendant Beaulieu appeared to be physically and mentally sound and not under the influence of intoxicants. Defendant Beaulieu appeared to understand the warnings. Defendant Beaulieu also indicated that he understood the Miranda rights and indicated that he was willing to speak to the officers. During the interview, Defendant Beaulieu appeared to understand the questions being asked of him and responded to the questions in an appropriate manner. The officers were

unarmed and did not threaten Defendant Beaulieu or make any promises to him to get him to speak to them. Defendant Beaulieu cooperated with the interview, but appeared to TFO Maloney to not be completely forthcoming in his answers to questions.

During the interview, which lasted between twenty and thirty minutes, Defendant Beaulieu indicated that he was the sole driver of the Jeep, that it belonged to him, and that it was registered in the name of his mother. Defendant Beaulieu eventually indicated that he did not want to the talk to the officers any further. The officers then terminated the interview and had Defendant Beaulieu returned to his cell.

The jail staff then brought Defendant Alonzo to the interview room. To TFO Maloney, Defendant Alonzo appeared to be mentally and physically sound and not under the influence of intoxicants. TFO Maloney and SA Ocken identified themselves to Defendant Alonzo as law enforcement officers, confirmed Defendant Alonzo's identity, and then read Defendant Alonzo the <u>Miranda</u> warnings. To TFO Maloney, Defendant Alonzo appeared to understand the warnings. Defendant Alonzo indicated that he understood the <u>Miranda</u> rights and indicated that he was willing to speak to the officers. Defendant Alonzo appeared to understand the questions being asked of him and responded to the questions in an appropriate manner. The officers did not threaten Defendant Alonzo or make any promises to him to get him to speak to them. Defendant also Alonzo cooperated during his interview.

The interview of Defendant Alonzo lasted approximately an hour. Defendant Alonzo initially told the officers that a cousin had driven him from Detroit to Minneapolis, where he had stayed at a hotel for several days, during which he had taken the firearm and a bundle of drugs from a different hotel room where he had found the door left open.

TFO Maloney questioned Defendant Alonzo about the likelihood of his statements. Defendant Alonzo then told TFO Maloney to "rip it up," which TFO Maloney took as Defendant Alonzo saying that his previous statements were false.

Defendant Alonzo told TFO Maloney that he had purchased narcotics from individuals in Detroit; that he had traveled to Minnesota; that he knew there were drugs inside the bundles in the Jeep; and that he had purchased rather than found the gun seized during the traffic stop. Defendant Alonzo then became reluctant to continue speaking. SA Ocken asked Defendant Alonzo if he did not want to continue talking because he did not want to inform on his associates, to which Defendant Alonzo nodded. The officers then ended the interview.

Defendant Beaulieu and Defendant Alonzo were subsequently released from the Benton County jail.

On May 27, 2015, officers arrested a number of individuals charged in the present case, including Defendant Beaulieu. TFO Maloney and another task force officer interviewed Defendant Beaulieu at the Beltrami County Sheriff's Office, where he was being held in custody. The officers interviewed Defendant Beaulieu in a slightly larger room that contained a small conference table, chairs, a sink, and a vending machine. The officers again did not record the interview.

After Defendant Beaulieu was brought into the room, the officers began the interview by reading him the <u>Miranda</u> warnings. To TFO Maloney, Defendant Beaulieu appeared to be mentally and physically sound, and not under the influence of intoxicants. Defendant Beaulieu appeared to understand the warnings and affirmatively indicated that he understood the <u>Miranda</u> rights and was willing to speak to the officers. Defendant Beaulieu also appeared to understand

the questions being asked of him and responded in an appropriate manner. The officers did not threaten Defendant Beaulieu or make any promises to him to get him to speak to them.

Defendant Beaulieu was cooperative during the forty-five minute interview. He told the officers that he had met Defendant Beasley in the fall of 2014, after which he began working for him as a driver. Defendant Beaulieu stated that he had driven other people to Defendant Beasley's location; he had previously driven Defendant Beasley; and he had also previously driven Defendant Michael Dominguez. Defendant Beaulieu also stated that he believed that his passengers were transporting currency. Defendant Beaulieu stated that he typically was paid in currency or heroin for each time he transported someone for Defendant Beasley.

With regard to the March 9, 2015, traffic stop, Defendant Beaulieu stated that he had travelled from the Red Lake Indian Reservation to Minneapolis with Defendant Alonzo, whom he referred to as "Trey," several days before March 9th; that Defendant Alonzo had paid for a hotel room for Defendant Beaulieu and for gasoline; and that he had seen Defendant Beasley and others at the hotel mixing seventy-five (75) to one hundred (100) grams of heroin into two hundred (200) grams. After the other task force officer sternly interjected saying to Defendant Beaulieu that the officers were not going to spend all day with him in order to get only a few minutes' worth of information, Defendant Beaulieu told the officers that he did not wish to speak to them further.  The officers then terminated the interview.

## II.   DEFENDANT BEAULIEU'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS, [Docket No. 855]

Defendant Beaulieu moves the Court to suppress all evidence obtained as a result of the March 9, 2015, traffic stop, including, as a product of the allegedly unlawful stop, the statements that he made during the March 10, 2015, and May 27, 2015, interviews.[4]

### A.  Traffic Stop

Defendant Beaulieu first moves the Court to suppress evidence gathered as a result of the March 9, 2015, traffic stop of the Jeep, arguing that Trooper James did not have a reasonable articulable suspicion of unlawful activity on which to initiate the original stop and, in any event, Troopers James and Flanagan impermissibly extended the duration of the stop under Rodriguez v. United States, 135 S. Ct. 1609 (2015). The Government argues that the traffic violations witnessed by Trooper James were sufficient to provide a basis for the initial stop, and that the Troopers did not unlawfully extend the stop to have Layka conduct a sniff-search of the vehicle.

### 1.  Standard of Review

"The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001) (quoting U.S. Const. amend. IV). Roadside traffic stops constitute seizures for the purposes of the Fourth Amendment. See, e.g., Delaware v. Prouse, 440 U.S. 648, 653 (1979). To be lawful, a traffic stop must be supported by at least a reasonable, articulable suspicion that a crime is being committed. Jones, 269 F.3d at 924 (citing Prouse, 440 U.S. at 663).

---

[4] Defendant Beaulieu filed his motion to suppress after the deadline set by the Court and asks the Court to nevertheless rule on the motion.  In support Defendant Beaulieu represents that his counsel had some trouble getting the Government's discovery in the present case because of its volume, which delayed his ability to file a suppression motion. The Court concludes that good cause exists to excuse the late filing of Defendant Beaulieu's motion to suppress.

Once a stop has been lawfully initiated, the officer is entitled to conduct an investigation, the scope of which must be reasonably related to the circumstances which gave rise to the stop. Rodriguez, 135 S. Ct. at 1614; Terry v. Ohio, 392 U.S. 1, 20 (1968); see also United States v. Cummins, 920 F.2d 498, 502 (8th Cir. 1990), cert. denied, 502 U.S. 962 (1991). "The scope of a Fourth Amendment intrusion 'will vary to some extent with the particular facts and circumstances of each case.'" Jones, 269 F.3d at 924 (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)). "The scope of the detention must be carefully tailored to its underlying justification." Royer, 460 U.S. at 500. "A traffic stop can become unlawful, however, if it is "prolonged beyond the time reasonably required" to complete its purpose." United States v. Olivera-Mendez, 484 F.3d 505, 509 (8th Cir. 2007) (quoting Illinois v. Caballes, 543 U.S. 405, 408 (2005). Accordingly, for an officer to lawfully prolong a stop beyond the time reasonably necessary to complete the tasks relating to the basis for the stop, the officer must have a reasonable articulable suspicion of further criminal activity. Rodriguez, 135 S. Ct. at 1615.

## 2. Analysis

Defendant first argues that Trooper James did not have a reasonable articulable suspicion of criminal activity on which to initiate the original stop of the Jeep. Trooper James testified that he had stopped the Jeep on the basis of the Jeep's weaving onto the centerline and then back onto the fog line, as well as, the fact that he saw that the back seat belt strap for Defendant Alonzo was hanging free and unsecured, which led him to believe that the back seat passenger was not wearing a seat belt as required by Minnesota statute.

As Defendant acknowledges in his memorandum, in the Eighth Circuit, any traffic violation, no matter how minor, will provide probable cause to justify a traffic stop. See, e.g., United States v. Houston, 548 F.3d 1151, 1153 (8th Cir. 2008). Defendant Beaulieu, however,

argues that the stop in this case was based on pretext and not justified by any traffic violation, asserting that Trooper James had been instructed to find a basis on which to stop the Jeep, that the Jeep's swerving over and onto the fog and center lines should be attributed to Trooper James following the Jeep, and that Trooper James's testimony that he could see the unsecured back seat belt strap was not credible.

The Court finds credible Trooper James' testimony that he could see the back seat shoulder belt strap hanging unsecured. Because Trooper James testified that could see that the strap was hanging unsecured, he articulated a reasonable basis to suspect that Defendant Alonzo was not wearing a seatbelt. In Minnesota, a passenger's failure to wear a seatbelt is an independent traffic violation that will justify initiating a stop of the vehicle. See State v. Wendorf, 814 N.W.2d 359, 361-62 (Minn. Ct. App. 2012). Accordingly, Trooper James could lawfully stop the Jeep on that basis alone.  Because Trooper James had an objectively reasonable articulable suspicion of a criminal activity on which to stop the Jeep, the mere fact that Trooper James was also subjectively looking for such a basis is irrelevant. Whren v. United States, 517 U.S. 806, 813 (1996) (holding that an officer's subjective intentions play no role in Fourth Amendment analysis).

Defendant Beaulieu next contends that, even if the initial stop was lawful, it became unlawful when the troopers unreasonably extended the stop past the point at which Trooper James concluded all tasks related to the initial stop by providing Defendant Beaulieu with the written warning ticket regarding the seat belt and weaving in his lane. In support, Defendant Beaulieu relies on Rodriguez v. United States, 135 S. Ct. 1609 (2015).

In Rodriguez, a canine-paired officer stopped Rodriguez for driving on the shoulder, a traffic violation. (Id. at 1613). After the officer completed all tasks relating to the basis for the

stop, he asked Rodriguez for permission to allow his dog to conduct a sniff-search of the exterior of Rodriguez's vehicle. (Id.). Rodriquez did not consent. (Id.). The officer then detained Rodriguez for approximately an additional seven minutes while he waited for a second officer to arrive, then retrieved his dog and conducted a sniff-search of the exterior of the vehicle, during which the dog indicated the presence of narcotics in the vehicle. (Id.). As a result, Rodriquez was indicted on narcotics charges. (Id.).  He later moved to suppress the evidence gathered as a result of the stop. (Id.). The Magistrate Judge recommended that the motion be denied, concluding that the officer did not have a reasonable articulable suspicion on which to prolong the stop after completing all tasks related to the initial stop, but reasoning that the seven minute extension of the stop was a *de minimis* intrusion on Rodriguez's Fourth Amendment rights. (Id.). The district court and the Eighth Circuit agreed. (Id. at 1614). The Supreme Court, however, reversed, holding that the officer had been required to have a separate reasonable articulable suspicion of criminal activity to extend the stop past the point at which he had completed all tasks related to the initial traffic stop. (Id. at 1615).

The Government asserts that here there was only a brief extension of the stop because Trooper Flanagan began the sniff-search immediately after Trooper James had given the warning ticket and Defendant Beaulieu refused his request to give his permission for the troopers to search the vehicle. In essence, the Government asserts that the extension was only a *de minimis* detention. However, the Supreme Court in Rodriquez held that even *de minimis* extensions of a traffic stop must be supported by a reasonable articulable suspicion of criminal activity. (Id. at 1615).

A court considers the totality of the circumstance, based on common sense judgments and inferences about human behavior, when determining whether an officer had "at least a minimal

level of objective justification" for prolonging a traffic stop. United States v. Stringer, 739 F.3d 391, 395 (8th Cir. 2014) (citing Illinois v. Wardlow, 528 U.S. 119, 125 (2000)).

The present case is distinguishable from the facts of Rodriguez. In Rodriguez, the Magistrate Judge had concluded that the officer did not have any objectively reasonable articulable suspicion of further criminal activity beyond the initial basis for the traffic stop when he further detained Rodriguez. Here, in contrast the troopers have articulated specific additional facts that Trooper James observed during the stop. Those observations gave rise to an objectively reasonable suspicion that Defendant Beaulieu and Defendant Alonzo were engaged in additional criminal activity beyond merely weaving and travelling with an unsecured seatbelt. Specifically, Trooper James observed that Defendant Alonzo kept interrupting Defendant Beaulieu to answer Trooper James' questions; that Defendant Alonzo, the only passenger, was sitting on the right side of the back seat, despite the front passenger seat being unoccupied; that both Defendant Beaulieu and Defendant Alonzo had freshly lit cigarettes; and that despite Defendant Alonzo saying that the two had been shopping at a Macy's, no Macy's shopping bags were visible in the cargo area of the Jeep. In fact, Trooper Flanagan testified at the motions hearing that Trooper James's observations, which were communicated to him when Trooper James returned to his squad car to conduct the computer records search, were, in Trooper Flanagan's training and experience, consistent with drug related activity.

The Eighth Circuit has noted that a passenger answering questions on behalf of a driver during a traffic stop is an unusual behavior that can support a reasonable suspicion of additional criminal activity. United States v. Quintero-Felix, 714 F.3d 563, 567 (8th Cir. 2013).  Other courts have considered an apparent inconsistency between a traveler's story and the contents of the vehicle, here the lack of any bags from a store at which Defendant Alonzo said the two had

17

shopped earlier in the day, as a circumstance that can support a reasonable articulable suspicion of criminal activity. See, e.g., United States v. Bravo, 306 F. App'x 436, 441 (10th Cir. 2009) (noting apparent discrepancy between amount of baggage in vehicle and travelers' stated purpose of traveling for a honeymoon supported reasonable suspicion for criminal activity). Other courts have considered strong smells from a vehicle interior as supporting a reasonable articulable suspicion of criminal activity. See, e.g., United States v. Christian, 43 F.3d 527, 530 (10th Cir. 1994) (noting that a freshly lit cigarette is a technique often used to mask the smell of drugs). Further, courts have considered a passenger's unusual seating arrangement as a circumstance that, in addition to other factors, may support a reasonable articulable suspicion of criminal activity. See United States v. Bristol, 819 F. Supp. 2d 135, 143 (E.D.N.Y. 2011) (noting that court must consider the passenger's unusual seating arrangement when determining whether reasonable articulable suspicion of criminal activity existed, even though the unusual seating arrangement by itself was insufficient to satisfy the standard).

On the totality of the circumstances, the Court concludes that the observations of the troopers prior to Trooper James giving Defendant Beaulieu a written warning, are independent articulable facts that created an objectively reasonable suspicion of additional criminal activity sufficient to prolong the stop very briefly, in order to conduct the dog-sniff search of the exterior of the Jeep here; all of which occurred almost immediately after Trooper James completed the tasks necessarily related to the basis for the initial traffic stop.

On the basis of all of the foregoing, the Court recommends **DENYING** Defendant Beaulieu's Motion to Suppress Evidence and Statements, [Docket No. 855], to the extent that Defendant Beaulieu seeks to suppress evidence arising as a result of the initiation of the traffic

stop or the troopers briefly prolonging the stop in order to conduct the dog-sniff search at issue here.

### B. Statements

Defendant Beaulieu also moves the Court to suppress the statements that he made during the March 10, 2015, and May 27, 2015, custodial interviews. The only basis on which Defendant Beaulieu suggests that those statements should be suppressed is that they arose as a result of and are therefore tainted by the allegedly unlawful traffic stop and subsequent road side searches of his vehicle on March 9, 2015, by Troopers James and Flanagan.

"Under the 'fruit of the poisonous tree' doctrine, the exclusionary rule bars the admission of physical evidence and live witness testimony obtained directly or indirectly through the exploitation of police illegality." United States v. Simpson, 439 F.3d 490, 493-94 (8th Cir. 2006) (citing Hamilton v. Nix, 809 F.2d 463, 465 (8th Cir. 1987)).

Because the Court has already concluded that both the initial traffic stop of the Jeep and the brief prolonging of the stop to conduct the dog-sniff search at issue here were supported by independent and separate appropriate reasonable suspicions of criminal activity, Defendant Beaulieu's argument that his statements should be suppressed as fruit of the poisonous tree necessarily fails.

Accordingly, the Court recommends **DENYING** Defendant Beaulieu's Motion to Suppress Evidence and Statements, [Docket No. 855], to the extent that Defendant Beaulieu seeks to suppress the custodial statements that he made during the March 10, 2015, and May 27, 2015, interviews.

### III.     DEFENDANT ALONZO'S MOTION TO SUPPRESS EVIDENCE FOUND IN VEHICLE, [Docket No. 671]

Defendant Alonzo also moves the Court to suppress evidence gathered as a result of the traffic stop of Defendant Beaulieu's vehicle on March 9, 2015.  He similarly argues that Trooper James did not have a reasonable articulable suspicion of criminal activity on which to originally stop the vehicle, and that the troopers did not have an independent reasonable articulable suspicion of additional criminal activity on which to briefly prolong the stop to conduct the dog-sniff search. These arguments fail for the reasons the Court already set forth with respect to Defendant Beaulieu's Motion to Suppress Evidence and Statements, [Docket No. 855]. See Section II.A.2, above.

Accordingly, the Court also recommends **DENYING** Defendant Alonzo's Motion to Suppress Evidence Found in Vehicle, [Docket No. 671].

### IV.     DEFENDANT ALONZO'S MOTION TO SUPPRESS DEFENDANT'S STATEMENTS, ADMISSIONS, AND ANSWERS, [Docket No.  672]

Defendant Alonzo also moves the Court to suppress the statements that he made during the March 10, 2015, custodial interview solely on the basis that the interview the tainted product of the allegedly unlawful traffic stop and subsequent road side searches of Defendant Beaulieu's vehicle on March 9, 2015.

As the Court has already concluded that the initial stop and subsequent searches of Defendant Beaulieu's vehicle on March 9, 2015, were lawful, the Court recommends **DENYING** Defendant Alonzo's Motion to Suppress Defendant's Statements, [Docket No. 672].

## V.   DEFENDANT ALONZO'S MOTION FOR SEVERANCE OR, IN THE ALTERNATIVE TO JOIN THE CO-DEFENDANT'S MOTIONS, [Docket No. 669]

Defendant Alonzo moves the Court to sever the trial of his case from that of his co-defendants.   In the alternative, Defendant Alonzo seeks leave of the Court to join in all the pretrial motions of his co-defendants.

### A.   Severance

Defendant Alonzo moves the Court, pursuant to Federal Rules of Criminal Procedure 8 and 14, to sever his case from those of his co-defendants.

### 1.   Standard of Review

An indictment may charge two or more defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). "For proper joinder under this provision, it is not necessary that every defendant have participated in or be charged with each offense." United States v. Warfield, 97 F.3d 1014, 1019 (8th Cir. 1996) (internal quotation and citation omitted). "[R]arely, if ever, will it be improper for co-conspirators to be tried together." Id. (citing United States v. Jackson, 64 F.3d 1213, 1217 (8th Cir. 1995)).

The Federal Rules of Criminal Procedure also provide that if joinder creates prejudice to either the Government or a defendant, the Court may sever a trial "or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). However, "[i]f, under Rule 8, joinder is proper, then the defendant seeking severance has a 'heavy burden' in demonstrating that a joint trial will impermissibly infringe his right to a fair trial." United States v. Hopkins, No. 11–230 (DWF/SER), 2011 U.S. Dist. LEXIS 127071, at *25–26 (D. Minn. Oct. 5, 2011) (citing Warfield, 97 F.3d at 1019). "There is a preference in the federal system for joint trials of

defendants who are indicted together." <u>Zafiro v. United States</u>, 506 U.S. 534, 537 (1993); <u>see</u> <u>also</u> <u>United States v. Clay</u>, 579 F.3d 919, 927 (8th Cir. 2009). "Joint trials play a vital role in the criminal justice system," because they achieve certain efficiencies, and because they "avoid[ ] the scandal and inequity of inconsistent verdicts." <u>Richardson v. Marsh</u>, 481 U.S. 200, 209-10 (1987). "Only in an unusual case will the prejudice resulting from a joint trial be substantial enough to outweigh the general efficiency of joinder." <u>Clay</u>, 579 F.3d at 927 (citing <u>United States v. Al–Esawi</u>, 560 F.3d 888, 891 (8th Cir. 2009)). "The risk of prejudice posed by joint trials is best cured by careful and thorough jury instructions." <u>United States v. Mickelson</u>, 378 F.3d 810, 818 (8th Cir. 2004).

 2. **Analysis**

 Defendant's motion to sever is conclusory and articulates no specific facts demonstrating either (1) that joinder of the defendants was improper under Rule 8(b), or (2) that continued joinder will create prejudice sufficient to warrant severance pursuant to Rule 14. Defendant offers only a conclusory assertion that the majority of the evidence in this case involves the other Defendants and would be prejudicial to his case.

 Defendant's motion as submitted on the present record is insufficient to sustain his heavy burden to demonstrate that severance is warranted. The Court could summarily recommend denying Defendant's motion on this basis alone.  However, in an abundance of caution, the Court notes that in addition to the fact that Defendant has failed to sustain his burden, the underlying alleged facts relevant to the present case indicate that joinder was indeed proper under Rule 8(b) and that severance pursuant to Rule 14 is not warranted on the present record.

 The underlying alleged facts articulated in support of the Indictment indicate that the Defendants participated in the same series of acts or transactions constituting the charged

offenses. See Fed. R. Civ. P. 8(b). The facts as set forth in the Indictment and in the testimony at the motions hearing indicate that the Defendant Alonzo and the other defendants, acting together, conspired with others to possess, with intent to distribute, controlled substances including heroin, methamphetamine, oxycodone, hydromorphone, hydrocodone, and methadone. (Indictment, [Docket No. 1]).   Accordingly, under Rule 8(b), joinder of the Defendants was proper where "they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses[,]" and it is not necessary that each Defendant have participated in each offense. Warfield, 97 F.3d at 1019 (citing Fed. R. Crim. P. 8). The facts set forth in the Indictment in the present case and in the testimony at the October 20, 2015, motion hearing, indicate that Defendant, along with other co-defendants and alleged co-conspirators, "did, among other things, facilitate, supervise, manage, transport, maintain residences, receive and transfer funds, and distribute controlled substances during the course of the conspiracy." (Indictment, [Docket No. 1], at ¶ 11).

Because joinder of the Defendants was proper under Rule 8(b), Defendant necessarily bears the heavy burden of demonstrating that a joint trial will impermissibly infringe on his right to a fair trial. Nothing in the record presently before the Court indicates that Defendant stands to incur any specific prejudice attributable to joinder of the Defendants that would be sufficient to warrant severance.

Defendant's conclusory assertion that the majority of the evidence pertains to other Defendants and would prejudicial to his case, is similarly insufficient to show Defendant will incur any specific prejudice attributable to joinder of the Defendants that would be sufficient to warrant severance.

In Bruton v. United States, 391 U.S. 123, 124 (1968), the petitioner and a co-defendant had been convicted of armed robbery in a joint trial after a postal inspector testified that Bruton's codefendant had confessed and had "expressly implicat[ed]" the petitioner. Id. at n.1. The trial court instructed the jury that the co-defendant's confession "if used, can only be used against the [co-defendant]. It is hearsay insofar as the [petitioner] is concerned, and you are not to consider it in any respect to the [petitioner], because insofar as he is concerned it is hearsay." Id. at 125 n. 2. The Supreme Court, however, concluded that:

> [T]he introduction of [the co-defendant's] confession posed a substantial threat to the petitioner's right to confront the witnesses against him, and this is a hazard we cannot ignore. Despite the concededly clear instructions to the jury to disregard [the co-defendant's] inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination. The effect is the same as if there had been no instruction at all.

Id. at 137. For that reason, the Supreme Court reversed the petitioner's conviction in Bruton. Id. at 126, 137.

However, even the Bruton court suggested that redaction from co-conspirator testimony may be sufficient to cure any prejudice caused by the introduction of a co-defendant's incrimination statement, and acknowledged that "[n]ot every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions." Id. at 134 n. 10, 135. In Richardson v. Marsh, 481 U.S. 200 (1987), the Supreme Court further distinguished between co-defendant statements that are "facially incriminating," and statements which merely are "incriminating by connection." Id. at 209. When a co-defendant's statement is facially incriminating of the defendant, redaction or even severance may be required because it is more difficult for jurors to set aside such evidence. Id. at 208. However,

the Court rejected the suggestion that the rule in <u>Bruton</u> extend to confessions that are incriminating by connection as both impractical and unnecessary. <u>Id.</u> at 208–09.

In the present case, Defendant has not supported his motion by identifying any specific incriminating co-defendant statements that he believes would, if introduced at trial, prejudice him. Moreover, Defendant has not articulated any specific reason why the jury would be unable to compartmentalize any redacted statements or evidence upon being given proper instruction by the Trial Judge to do so. (<u>See, gen.</u> Def.'s Motion for Severance, [Docket No. 669]).

As articulated above, there is a strong preference in the federal system for joint trials. In light of that preference, and at this early juncture, where Defendant can only invite the court to speculate as to what evidence the Government might actually seek to introduce at a joint trial, severance is not, at this time, appropriate. "Severance is a remedy that can be provided at the time of trial if appropriate under the circumstances." <u>United State v. Billups</u>, No. 06-cr-129 (PJS/AJB), F. Supp. 2d 697, 706 (D. Minn. 2006).

For all the reasons articulated above, the Court recommends **DENYING** Defendant's Motion for Severance, or in the Alternative, to Join in the Co-defendant's Motions, [Docket No. 669], without prejudice, to the extent Defendant seeks severance of his case from those of his co-defendants.

### B. Co-defendant Motions

Defendant also alternatively moves the Court for an Order allowing him to adopt all of the pretrial motions of all of his co-defendants.

The Court notes that other courts faced with motions for blanket authorization to join in all motions of co-defendants, like the motion here, have denied such motions as fatally vague in the absence of the movant's statement identifying each specific co-defendant motion he wished

to join, as well as, his basis for standing and the specific factual and legal basis for joining in each motion. <u>See, e.g.</u>, <u>United States v. Harvey</u>, No. 02:12-CR-113, 2014 WL 657595, at *3 (W.D. Pa. Feb. 20, 2014) (requiring a defendant moving to join in co-defendant's motion to file a separate statement of joinder establishing standing and the factual and legal basis for a joint application, even where the motion was unopposed); <u>see also, e.g.</u>, <u>United States v. Johnson</u>, No. 08 CR 466, 2008 WL 5111166, at *3 (N.D. Ill. Dec. 3, 2008) (concluding that motion to join in all motions of co-defendants was fatally vague).   The undersigned finds persuasive the practice of those courts that have required a defendant seeking to join in co-defendants' motions to specifically identify in his motion papers: 1) each co-defendant motion which he is seeking to join; 2) to allege a basis for standing in each such motion; and 3) to allege his legal and factual basis for joining in each such motion.   Here, Defendant has not specifically identified in any way whatsoever his basis for standing to join in any pre-trial motions filed by his co-defendants, nor has he offered any specific factual or legal basis for joining in any pretrial motion filed by his co-defendants.

Accordingly, the Court will **DENY** Defendant Alonzo's Motion for Severance or, in the Alternative, to Join the Co-Defendant's Motions, [Docket No. 669], to the extent that Defendant Alonzo seeks to the join in all of the motions of all his co-defendants.

## VI.   CONCLUSION

A. Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant Alonzo's Motion for Severance or, in the Alternative, to Join the Co-Defendant's Motions, [Docket No. 669], is **DENIED**, to the extent it seeks leave to join in all of the pretrial motions of all of Defendant Alonzo's co-defendants.

B.  Based on the foregoing and all the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED**:

1.  That Defendant Beaulieu's Motion to Suppress Evidence and Statements, [Docket No. 855], be **DENIED**, as set forth above;

2.  That Defendant Alonzo's Motion for Severance or, in the Alternative, to Join the Co-Defendant's Motions, [Docket No. 669], be **DENIED without prejudice**, to the extent that it seeks severance of Defendant Alonzo's case from that of his co-defendants;

3.  That Defendant Alonzo's Motion to Suppress Evidence Found in Vehicle, [Docket No. 671], be **DENIED**, as set forth above; and,

4.  That Defendant Alonzo's Motion to Suppress Defendant's Statements, Admissions, and Answers, [Docket No.672], be **DENIED**, as set forth above.

Dated: December 3, 2015                                    s/ Leo I. Brisbois
                                                           Leo I. Brisbois
                                                           U.S. MAGISTRATE JUDGE

## N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]"  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.